IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NORMAN JOHNSTON,

               Plaintiff        :

      v.                       :      CIVIL ACTION

                       :

**JOHN WETZEL**, Secretary of the   :      No. 1:16-cv-268
Pennsylvania Department of
Corrections ("DOC"); **SHIRLEY**      :
**MOORE-SMEAL**, Executive Deputy
Secretary of the DOC; **STEVEN**    :
**GLUNT**: Regional Deputy
Secretary of the DOC; **MICHAEL**   :
**OVERMYER**, Superintendent SCI Forest;  :    **JURY TRIAL DEMANDED**
**DEREK OBERLANDER**, Deputy
Superintendent SCI Forest,        :

              Defendants    :

_____

## COMPLAINT

### Introduction

    1.   The Plaintiff, Norman Johnston, is a 66 year old prisoner who has been held in solitary confinement for more than 17 consecutive years without any rational justification and without being afforded any meaningful process to redress his indefinite solitary confinement or to rectify the physical and psychological harm it has inflicted on him.  His confinement to a solitary confinement cell for 23 hours a day under deplorable conditions has harmed his mental and physical health, resulting in permanent damage.

2.   The extreme, cruel and unusual conditions of Johnston's confinement coupled with being subjected to sadistic "psychological mind-games" without any meaningful review process to redress his indefinite confinement in solitary confinement violate 42 U.S.C. §1983, as well as the Eighth and Fourteenth Amendments to the United States Constitution.

3.   Johnston is seeking injunctive, declaratory, and monetary relief to redress these violations of his constitutional rights.

### Jurisdiction and Venue

4.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 1243(a)ᴵᴵ3).

5.   This Court is the appropriate venue pursuant to 28 U.S.C. §1391(b)(2), because the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

### Parties

6.   Plaintiff, Norman Johnston (hererinafter "Johnston"), is and was at all times relevant to this action a prisoner in the custody of the Pennsylvania Department of Corrections ("DOC").  He is currently incarcerated in solitary confinement at the State Correction Institution ("SCI") Forest.

7.   Defendant, John Wetzel, is the Secretary of the DOC.  His employment and mailing address is 1920 Technology Parkway, Mechanicsburg, PA 17050-8507.  Defendant Wetzel is sued in his individual and official capacity.

8.   Defendant, Sherley Moore-Smeal, is the Executive Deputy Secretary of the DOC.  Her employment and mailing address is 1920 Technology Parkway, Mechanicsburg, PA 17050-8507.  Defendant Smeal is sued in her individual and official capacity.

9.   Defendant, Steven Glunt, is the Regional Deputy Secretary of the DOC.  His employment and mailing address is 1920 Technology Parkway,

Mechanicsburg, PA 17050-8507.  Defendant Glunt is sued in his individual and official capacity.

10.   Defendant, Michael Overmyer, is the Superintendent of SCI Forest. His employment and mailing address is SCI Forest, 1 Woodland Drive, Marienville, PA 16239.  Defendant Overmyer is sued in his individual and official capacity.

11.   Defendant, Derek Oberlander, is the Deputy Superintendent of Facilities Management at SCI Forest.  His employment and mailing address is SCI Forest, 1 Woodland Drive, Marienville, PA 16239.  Defendant Oberlander is sued in his individual and official capacity.

### Statement of Facts

12.   Johnston was committed to the DOC in 1980 following his conviction for homicide.  He is serving a sentence of life imprisonment.

13.   On August 1, 1999, while confined at the 20th Century prison, SCI Huntingdon, which was opened in 1882, Johnston used a hacksaw blade to cut the bar in his cell window and walked away from the prison.  He was not discovered missing by prison officials for more than 12 hours.

14.   After three weeks of freedom, Johnston was subsequently apprehended on August 20, 1999 in Chester County, Pennsylvania.  He was taken to SCI Camp Hill and placed in solitary confinement because of his escape from SCI Huntington.  He was sanctioned approximately 18 months disciplinary custody time by the DOC for his escape, and he was subsequently sentenced by the Court of Common Pleas of Huntington County, Pennsylvania, to 3½ to 7 years imprisonment on the escape charge.  Other than the theft of a vehicle, authorities did not allege or accuse Johnston of committing any other crimes while he was on escape.

15.   Johnston was held in solitary confinement at SCI Camp Hill from

3

August 20, 1999 until February 25, 2005, when he was transferred to SCI Forest.

16.     In December, 2004, Jeffrey Beard, former Secretary of the DOC, informed Johnston that he is being transferred to one of the DOC's new prototypical maximum security prisons at SCI Forest where he will be permitted to eventually work his way back into population.

17.     Johnston was transferred to SCI Forest on February 25, 2005, and confined to solitary confinement.  He remains confined in solitary confinement at SCI Forest at the time this complaint is filed.

18.     At the time this complaint is filed, Johnston has spent more than 17 consecutive years in solitary confinement.

19.     Except for one hour of outside exercise alone in a small cage five days a week, weather permitting, Johnston is confined 24 hours a day alone in his cell, with no human interaction or external stimulation of any sort.

20.     Johnston is confined amongst disciplinary custody and mentally ill prisoners who incessantly scream, yell, and bang on their metal toilets, tables, or cell doors 24 hours per day, it was commonly referred to amongst the guards and other inmates as "gang warring" with each other as a form of entertainment.  Often times these same disciplinary and mentally disturbed inmates would almost daily spit and throw bodily fluids on each other or other prisoners whom had the misfortune to be in an exercise cage in close proximity during the outside yard period.  Unless it involved staff, prison official did nothing to curtail this behavior.

21.     The more than 17 years Johnston has been in solitary confinement, his cell has been lighted 24-hours per day, with no reprieve during day or night.

22.     For almost the entire time of his 17 years of solitary

confinement, Johnston has been permitted one or two hours of time outside, five days of the week, in a fenced-in exercise cage that is slightly larger than his cell, and he is allowed this time only if weather conditions are determined by prison staff to be acceptable, or the institution is not on one of its frequent lockdowns.

23.    During the 17 years of solitary confinement, Johnston has not had access to any exercise or recreational equipment.

24.    During the 17 years of his solitary confinement, Johnston has been forced to eat all of his meals alone in his cell.

25.    During the 17 years of his solitary confinement, Johnston has not been permitted to have any contact visits with his family.  All his visits are non-contact behind a glass partition.  Johnston is kept in handcuffs and leg shackles during all his non-contact visits.

26.    During his 17 years of solitary confinement, Johnston is prohibited from participating in organizational, vocational, or educational activities within the prison.

27.    During the 17 years of solitary confinement, Johnston must undergo a mandatory strip-search any time he leaves his cell.  This includes every time he goes to the exercise cage and to the showers or medical appointments.

28.    The almost 12 years he has been in solitary confinement at SCI Forest, his cell has had a solid steel door which effectively prevents prisoners from speaking to one another or with their counselor or other staff without shouting to be heard.  Often times the noise level on the block is so loud it prevents communicating with his counselor or other staff.

### Johnston's Long-Term Solitary Confinement is a Deprivation of his Basic Human Needs

29.    Johnston had been deprived of basic and fundamental human needs due to his long-term solitary confinement, including, but not limited to, the

following: mental health and environment stimulation; social interaction; sleep; ability to concentrate and memory; and a reasonable opportunity to exercise.

30.   The entire time Johnston has been at SCI Forest, he was told on multiple occasions by prison officials, including Defendants Overmyer and Oberlander, that "the only way an inmate is leaving Forest is out the front door when his time is up."

31.   Prison officials at SCI Forest, including Defendants Overmyer and Oberlander, told Johnston on a number of occasions that he was what they called "a career ending decision" and since the Secretary put him on a Restricted Release List ("RRL")--"let him take you off the RRL" because they are not jeopardizing their career by giving me a favorable recommendation.

32.   As the duration of Johnston's solitary confinement grew longer without any realistic hope of it ending, he began to experience increasing feelings of anxiety, frustration, sleep insomnia, difficulty concentrating, memory loss, and depression coupled with suicide thoughts.

33.   The older Johnston got while in solitary confinement the more heightened and exacerbated his depression, anxiety, sleep insomnia, concentration and memory problems have come to be.  His mental stability has became progressively worse each year and it is now challenging for him to perform the most basic tasks such as remembering his age or names of his closest family members, spelling the simplest words, sleeping more than 3 or 4 hours, exercising, reading and writing, and simply getting out of bed to face another day of a meaningless monotony of life in solitary confinement.

34.   Johnston did not experience these psychological problems when he was first placed in solitary confinement 17 years ago.

35.   Johnston has increasing difficulty sleeping.  He wakes up

frequently throughout the night and has difficulty getting back to sleep.

36.   Johnston no longer has the capacity to feel empathy for others that he once had, his emotional capacity has been diminished by the prolonged deprivation of human contact and interaction.

37.   Johnston has increased difficulty concentrating, he has difficulty sustaining thought or focusing on a subject for more than a few minutes.  This problem has gotten worse each year his solitary confinement has continued.

38.   When reading, Johnston no longer has the ability to concentrate on the material he is reading.  When writing, Johnston must write increasingly shorter letters to family and friends, as it has become more difficult for him to concentrate long enough to write letters.

39.   Johnston has permanently suffered severe damage to his short-term memory capacity.  He struggles to recall acts performed minutes or hours before.

40.   Depression, anxiety, asocial feelings, cognitive impairment, memory loss, and concentration difficulties are well-established adverse reactions to prolonged solitary confinement.  Neuroscience has also established that prolonged isolation damages brain function and physically diminishes parts of the brain.

41.   Johnston may never recover the normal human capacity to have empathy and caring feelings for others, he feels distanced and disassociated from other people.

42.   There are often times when Johnston goes days without speaking to another person, in large part because he no longer has rudimentary social skills.

43.   By continuing to hold Johnston in solitary confinement, Defendants are substantially increasing the actual harm to Johnston with each day longer

he unnecessarily spends in solitary confinement.  The psychologically devastating conditions imposed on Johnston will continue to exacerbate the rapid deterioration of his mental health.  Because of Johnston's advanced age, even if he's released from solitary confinement, he will likely struggle with depression for the rest of his life.

44.   Defendants Overmyer and Oberlander, acting with a sadistic state-of-mind, has exacerbated Johnston's psychological pain and suffering by repeatedly deceiving him into thinking his release to population was imminent, only to inform him weeks later "they were only kidding."

45.   In July, 2014, November, 2014, and July, 2015, Defendants Wetzel, Smeal and former Regional Deputy Secretary Danial Burns directed Defendants Overmyer and Oberlander to develop a step-down to transition Johnston back into population.  When that did not happen, in November, 2014, Regional Deputy Secretary Burns specifically informed Defendants Overmyer and Oberlander to do an accelerated step down and then return Johnston to population.  After Johnston complained to Defendants Overmyer and Oberlander pertaining to him not doing an accelerated step down in order to be placed in population, in June, 2015, both Overmyer and Oberlander laughed and stated; "Burns retired and he didn't put that in writing."

46.   In June, 2016, after Johnston completed a one-year RRL step down plan to transition back into population, Defendants Overmyer and Oberlander informed him that SCI Forest will, in accordance with DOC policy, submit his June, 2016, RRL Review Package to Central Office and recommend that he be returned to population.

47.   On September 16, 2016, at Johnston's 90 day Program Review Committee ("PRC") review, he complained to Defendants Overmyer and Oberlander that, in violation of DOC policy, SCI Forest did not send his June, 2016 RRL

Review Package to Central Office in order for the Secretary to conduct an Annual RRL Review.   Defendants Overmyer and Oberlander once again informed Johnston that, despite what they told him a few months earlier, that Overmyer retires in 2017, and Oberlander has a few more years to go until retirement, so Johnston should be patient and maybe next year he might go to population.

48.   Defendants Overmyer and Oberlander has never expressed a concern that if Johnston was released to population he might pose a security risk. Just the opposite is true, Overmyer and Oberlander both have repeatedly said to Johnston that SCI Forest employs all the advanced 21st Century technology as a security tool to guard the prison perimeter, including more than 500 security cameras.   Overmyer and Oberlander repeatedly told Johnston nobody is escaping from Forest.   Defendants Overmyer and Oberlander have only expressed concern that its a potential "career ending decision" putting Johnston in population, and they are not jeopardizing their career by releasing him to population.

49.   Defendants Overmyer and Oberlander acted with a sadistic state-of-mind in subjecting Johnston to years of "psychological mind-games" that was so mentally and physically devastating as to amount to "psychological torture" in violation of the Eighth Amendments prohibition against cruel, harsh, and unusual punishment.   The psychological pain and suffering resulted in Johnston not eating, severe depression, sleep insomnia, suicide thoughts, devastating anxiety attacks, weight lose, and crippling inability to concentrate, severe headaches, and the inability to simply function on a daily basis because of the devestating psychological trauma he experienced as a result of Overmyer and Oberlander's deliberate "psychological mind-games."

50.   Despite the obvious and thoroughly documented risks and harm that result from long-term solitary confinement, the mental health department at

SCI Forest never clinically examined Johnston, or even questioned him, regarding the psychological, emotional, or cognitive impact that his long-term solitary confinement has had and continues to have on him.

51.   Johnston has sent numerous inmate request slips to SCI Forest Psychologist, Dr. Bruce Simons, requesting to be seen by a Psychiatrist, but he did not receive a reply and he was never seen by a psychiatrist.

### Restricted Release List and Lack of Meaningful Review

52.   In 2003 or 2004, the DOC created a special status called the Restricted Release List ("RRL"). Prisoners placed on the RRL by the Secretary are held in indefinite, potentially permanent, solitary confinement.

53.   RRL prisoners are not permitted to re-enter the general population without the express authorization of the Secretary of the DOC.

54.   Johnston was placed on the RRL in June, 2004 by former DOC Secretary Jeffery Beard.

55.   The sole decision-maker regarding whether to remove and/or keep a prisoner on the RRL in solitary confinement is the Secretary of the DOC.

56.   In October, 2012, DOC policy was changed to mandate an annual review of RRL prisoners solitary confinement by the Secretary of the DOC.

57.   The prisoners annual RRL review by DOC policy is to take place annually the month the Secretary initially placed the prisoner on the RRL.

58.   The annual review process for RRL prisoners involves the circulation of a 46 vote sheet by the RRL prisoner's assigned counselor at the prison where the prisoner is confined. Select staff members and officials at the prison vote on whether or not to recommend a prisoner for removal from the RRL. The process and standards for recommending removal or what information is included in the 46 vote sheet is opaque.

59.   The RRL annual 46 vote sheet is sent from the prison where the RRL

prisoner is held to the DOC Central Office, where the Regional Deputy
Secretary and Executive Deputy Secretary also provide recommendations.  As
with the process at the prisons, the process and standard for recommending
removal are opaque.

60.    After all the recommendations are provided to the Secretary of the
DOC, the Secretary is the sole decision maker on whether to remove a prisoner
from the RRL or to continue holding the prisoner in solitary confinement on
the RRL.  Again, the standards and process for decision-making are unknown and
seemingly arbitrary.

61.    The entire process for routing of the RRL 46 vote sheet by the
prisoner's counselor and annual RRL review process by the DOC's Central Office
is done without any imput from the prisoner, and the prisoner is never
provided any rationale sheet with information regarding the reason for the
recommendations of any of the staff members or officials.

62.    Prisoners on the RRL are never provided anything in writing from
the Deputy Secretaries recommendation and the reason for the Secretary's final
decision.  There is no Administrative appeal process for an RRL prisoner to
challenge the recommendations or final-decision by the Secretary.

63.    Prisoners on the RRL are not provided any substantive information
regarding the basis for any decision made by the DOC Secretary.  The Secretary
only communicates the annual RRL review decision to officials at the prison
where the RRL prisoner is confined.  If prison officials where the RRL
prisoner is confined are unhappy with a final annual RRL review decision by
the Secretary of the DOC, prison officials holding the RRL prisoner will
incredibly simply ignore it and then falsely convey to the RRL inmate that the
Secretary's decision was unfavorable to him and continue to confine the RRL
prisoner in solitary confinement.

64.    Johnston is seen by the Program Review Committee ("PRC") for 90 day reviews--but he is not given an opportunity to speak regarding his solitary confinement--the PRC at the 90 day reviews only addresses issues that Johnston may be having in solitary confinement or for privileges, but not the appropriateness or justification for his continued solitary confinement on the RRL.

65.    In the case of RRL prisoners, population is never on the table during the 90 day PRC reviews and there is no appeal from the PRC decision, the RRL prisoner is automatically continued in solitary confinement.  However, prisoners confined in solitary confinement on Disciplinary Custody ("DC") or Administrative Custody ("AC") status have the opportunity to request to be released to population at their 90 day PRC reviews and, by DOC policy, DC and AC status prisoners can file an appeal from the PRC's decision to continue them in solitary confinement.  Although DC and AC status prisoners only spend a relativity short period of time in solitary confinement, DOC policy, DC-ADM-801 and 802, grants them the right every 90 days to request the PRC to release them to population and to appeal any PRC decision to continue to confine them in solitary confinement, but despite RRL prisoners being confined sometimes decades in solitary confinement, DC-ADM-802--specifically denies them the same right to request population during their 90 day PRC reviews or an opportunity to appeal the PRC decision to continue the RRL prisoner in solitary confinement.

66.    During Johnston's scheduled June, 2014, Annual RRL Review, Defendant Wetzel communicated to SCI Forest to do a step-down to return Johnston to population.  However, Defendants Overmyer and Oberlander informed Johnston that Central Office said to develop a step-down plan for his next annual RRL review scheduled for June, 2015.

67.   In November, 2014, in response to Johnston's complaints pertaining to Defendants Overmyer and Oberlander's refusal to allow him to do a step down to return to population, Regional Deputy Secretary Burns directed Overmyer in Johnston's presence to do an accelerated step down and return Johnston to population.

68.   During Johnston's scheduled June, 2015, annual RRL review, Defendant Wetzel simply communicated the same decision as his June, 2014, annual RRL review decision, and ignored by SCI Forest, that SCI Forest will do a step down plan to return Johnston to population.

69.   Instead of doing an accelerated step down as directed by Regional Deputy Secretary Burns, Defendants Overmyer and Oberlander directed Johnston to do a one-year step down beginning on July 31, 2015.

70.   In June, 2016, Defendants Overmyer and Oberlander told Johnston that he successfully completed the one-year step down and his June, 2016, RRL Annual Review Package will be sent to Central Office to have him removed from the RRL and placed into population.

71.   On September 16, 2016, Johnston appeared before the PRC for his scheduled 90 day review, he complained to Defendants Overmyer and Oberlander at the PRC review that his counselor informed him that he is unable to determine what happened to his June, 2016--RRL Annual Review Package because it was never sent to Central Office.  Defendants Overmyer and Oberlander informed Johnston, in violation of DOC policy, they are not going to transmit his June, 2016, RRL Annual Review Package to Central Office.  Both Overmyer and Oberlander said to Johnston that Overmyer retires in 2017, so he should be patient.

72.   Although by DOC policy, DC-ADM-802, the sole decision-maker, Defendant Wetzel, in June, 2014, directed SCI Forest prison officials to do a

step-down and return Johnston to population, but when SCI Forest officials did not comply, Johnston sent Defendants Wetzel and Smeal letters of complaint, but Defendants Wetzel and Smeal did absolutely nothing to remedy the futility of Johnston's situation, including by not even sending Johnston a reply to his complaints explaining why he continues to remain in solitary confinement despite his decision in June, 2014, that SCI Forest will do a step down to place Johnston back into population.

73.   On information and belief, Defendant Wetzel, the sole decision-maker, in actuality does nothing to enforce his RRL Annual Review decisions communicated to the prison where the RRL prisoner is held.

74.   Johnston has not been accused of any disciplinary infractions in more than 15 years, and SCI Forest officials has never expressed a concern that Johnston would pose an escape risk if placed in population at SCI Forest, a maximum security facility.

75.   DOC policy does not provide a prisoner on the RRL any opportunity to challenge his continued solitary confinement by providing information or input to the decision-maker.

76.   Johnston has never been provided with any written or other substantive explanation of the basis for the decision to keep him in solitary confinement.

77.   Defendants have never told Johnston what is required of him in order to be released to the general population.

78.   Since June, 2014, two different Regional Deputy Secretaries of the DOC have recommended that Johnston be returned to population. The Executive Deputy Secretary of the DOC, Defendant Smeal, on two separate occasions has recommended that Johnston be returned to population. The Secretary of the DOC, Defendant Wetzel, the sole decision-maker, has on two separate occasions

14

specifically directed SCI Forest officials to do a step-down and return Johnston to population. Yet, despite all of the above decisions from the DOC's Central Office, Defendants Overmyer and Oberlander continue to refuse to release Johnston to population, not because they believe he would pose a security risk if placed into population at SCI Forest, but because they view him as a "career ending decision." Under this esoteric scenario, there is not one-iota of even the appearance of meaningful due process review.

### Roles of the Defendants in Continuing Johnston in Solitary Confinement

79. Defendants are aware of the harms and risks caused by long-term solitary confinement, especially in the case of elderly prisoners.

80. Forcing Johnston to live in a very small concrete and steel area, smaller than a bathroom, in complete isolation, amongst severely mentally ill and disciplinary custody prisoners, has resulted in physical and psychological harm that are obvious to any person, including Defendants.

81. Defendants are aware that Johnston is being deprived of his basic human needs for mental and physical health, environmental stimulation, social interaction, exercise, sleep, and dignity on account of his unnecessarily long-term solitary confinement.

82. Defendants have articulated no valid basis for Johnston's solitary confinement.

83. Defendants Wetzel is the Secretary of the DOC, its highest-ranking DOC official. As such he is the only official with the authority to remove Johnston from the RRL and to authorize his release into the general population.

84. Defendant Wetzel is aware of the risks and harms associated with long-term solitary confinement. These risks and harms are known and understood by prison officials.

85.   Defendant Wetzel has not taken any measure to release Johnston from solitary confinement by ordering SCI Forest officials to abide by his RRL Annual Review decisions to place Johnston into population.

86.   Defendant Wetzel has not provided Johnston with a rationale as to the basis for his continued solitary confinement.

87.   Defendant Wetzel has never sought any imput from Johnston, qualified medical professionals, or any other party regarding his solitary confinement.

88.   Defendant Smeal is the Executive Deputy Secretary of the DOC, its second highest ranking DOC official.  She makes a recommendation as to whether Johnston should be released to the general population or remain in solitary confinement.

89.   Defendant Smeal is aware of the risks and harms associated with long-term solitary confinement.  These risks and harms are known and understood by prison officials.

90.   Defendant Smeal has not taken any measure to release Johnston from solitary confinement except recommend his release on two occasions, but she never ordered SCI Forest officials to abide by Central Office's decisions to place Johnston in population.

91.   Defendant Smeal has never provided Johnston with a rationale as to the basis for his continued solitary confinement.

92.   Defendant Smeal has never informed Johnston what he must do in order to be released from solitary confinement.

93.   Defendant Smeal has never made any effort to seek input from Johnston, qualified medical professionals, or any other qualified person regarding his solitary confinement.

94.   Defendant Glunt is the Regional Deputy Secretary of the DOC for

the Western Region.  He makes a recommendation as to whether Johnston should be released to general population or remain in solitary confinement.

95.    Defendant Glunt is aware of the risks and harms associated with long-term solitary confinement.  These risks and harms are known and understood by prison officials.

96.    Defendant Glunt has not taken any measure to release Johnston from solitary confinement, or to recommend his release.

97.    Defendant Glunt has not informed Johnston as to the basis for his continuing solitary confinement, nor of the basis for his own recommendations.

98.    Defendant Glunt has made no effort to seek input from Johnston, qualified medical professionals, or any other qualified person regarding his solitary confinement.

99.    Defendant Overmyer is the Superintendent of SCI Forest.  He makes a recommendation as to whether Johnston should be released to the general population or remain in solitary confinement.  He is also responsible for the operation of SCI Forest.

100.    Defendant Overmyer is aware of the risks and harms associated with long-term solitary confinement.  These risks and harms are known and understood by prison officials.

101.    Defendant Overmyer has not taken any measure to release Johnston from solitary confinement, or to carry out the Secretary of the DOC's decision to place Johnston in population.

102.    Defendant Overmyer has never provided Johnston with a bona-fide reason for continuing him in solitary confinement, other than informing him that he is a potential "career ending decision."

103.    Defendant Overmyer has repeatedly informed Johnston that he's not going to release him to population because he's a potentially "career ending

decision." Defendant Overmyer has never expressed a concern that Johnston might attempt to escape from SCI Forest if released to population.

104.    Defendant Overmyer has provided Johnston with inaccurate and misleading information regarding the Annual RRL Review decisions communicated to SCI Forest by Central Office for the sole purpose to continue to unnecessarily confine Johnston to solitary confinement

105.    Defendant Overmyer, acting with a sadistic state-of-mind, has subjected Johnston to years of "psychological mind-games" that has resulted in causing Johnston to suffer significant physical and mental pain.

106.    Defendant Overmyer has repeatedly denied Johnston's request to review with his counselor the Annual RRL 46 Vote Sheet that is routed amongst select SCI Forest prison officials for their recommendation and then sent to Central Office for his annual RRL review.

107.    Defendant Overmyer has refused to remedy Johnston's numerous complaints he's filed pertaining to his long-term solitary confinement amongst disciplinary and mentally disturbed prisoners who would incisively scream, bang on their cell doors, metal toilets and tables at all hours of night and day making it impossible to sleep or concentrate.

108.    Defendant Oberlander is the Deputy Superintendent for Facilities Management at SCI Forest.  He makes a recommendation as to whether Johnston should be released to general population or remain in solitary confinement.

109.    Defendant Oberlander is a member of the Program Review Committee.

110.    Defendant Oberlander is aware of the risks and harms associated with long-term solitary confinement.  These risks and harms are known and understood by prison officials.

111.    Defendant Oberlander has not taken any measure to release Johnston from solitary confinement, even when directed by the Secretary of the

DOC to work Johnston back into population.

112.   Defendant Oberlander has not informed Johnston as to the basis for his continuing solitary confinement, nor of the basis for his own recommendations.

113.   Defendant Oberlander has made no effort to seek input from Johnston, qualified medical professionals, or any other qualified person regarding his solitary confinement.

114.   Defendant Oberlander has informed Johnston that he's not going to release him to population because he's a potential "career ending decision."

115.   Defendant Oberlander has deliberately provided Johnston with inaccurate and misleading information regarding the Annual RRL Review decisions communicated to SCI Forest by Central Office for the sole purpose to confine Johnston unnecessarily in solitary confinement.

116.   Defendant Oberlander, acting with a sadistic state-of-mind, has subjected Johnston to years of "psychological mind-games" that has resulted in causing Johnston to suffer significant physical and mental pain.

117.   On September 16, 2016, Johnston appeared before the PRC for his 90 day review, he complained to Defendants Oberlander and Overmyer that his June, 2016, Annual RRL 46 Vote Sheet was not sent to Central Office for his June, 2016, Annual RRL Review by the Deputy Secretaries and Secretary of the DOC.  Defendant Oberlander informed Johnston that Defendant Overmyer retires in 2017, so he should be patient.

118.   Defendant Oberlander has repeated denied Johnston's request to review with his counselor the Annual RRL 46 Vote Sheet that is routed amongst select SCI Forest prison officials for their recommendation and then sent to Central Office for his Annual RRL review.

119.   Defendant Oberlander has denied Johnston's repeated requests to

correct obviously incorrect and erroneous information that appears on his 90
day PRC Rationale Sheets in which Johnston's counselor relies upon to include
in the Annual RRL 46 Vote Sheet routed every year amongst select SCI Forest
officials to recommend removal/continuation on the RRL.

120.   Defendant Oberlander has informed Johnston on numerous occasions
that "nobody is escaping from SCI Forest" and the "only way an inmate is
leaving Forest is by the front gate."

121.   Defendant Oberlander has repeatedly denied Johnston's requests to
be informed of SCI Forest's "recommendation" and basis for the recommendation
made each year by selected SCI Forest officials whether to recommend/continue
him on the RRL.

122.   Defendant Oberlander has informed Johnston on a number of
occasions that he will not require Johnston's counselor or unit manager to
provide him with the most rudimentary information regarding his Annual RRL 46
Vote Sheet or the Annual RRL Review decisions by Central Office.

123.   On numerous occasions in which Defendant Oberlander has spoken
with Johnston, he has been dismissive, refusing to even discuss or consider
releasing Johnston from solitary confinement.

### Exhaustion of Administrative Remedies

124.   Under the DOC's Administrative Custody policy, DC-ADM-802, "[a]ll
issues concerning an inmate's placement in AC custody or the duration,
conditions or other circumstances of his/her AC placement must be addressed
through the procedures set forth in this directive and may not be addressed
through the procedures set forth in DOC policy DC-ADM-801, 'Inmate Discipline'
or DC-ADM-804, 'Inmate Grievance System.'  DC-ADM-802 further provides that
all issues must be addressed at PRC hearings, and that appeals regarding these
issues must be filed to the Superintendent within two days after the hearing.

Once the Superintendent replies to a DC-ADM-802 appeal, a prisoner must appeal to Central Office if he or she is dissatisfied with the response.

125.   Prisoners on the Restricted Release List, such as Johnston, are held pursuant to the DC-ADM-802 Administrative Custody policy and are considered AC status RHU prisoners.

126.   Johnston has appealed Defendant Overmyer's decision to Central Office and was told by, Ms. Varner, Chief of the Secretary's Office of Inmate Grievances Appeals that "appeal from placement or continuation on the RRL is not permitted.

127.   In July, 2013, July, 2014, July, 2015, and July, 2016, Johnston filed A/C appeals under DC-ADM-802 and DC-ADM-804 "Inmate Grievances" over the denial of meaningful RRL reviews or his indefinite solitary confinement and being subjected to sadistic "psychological mind-games" that has subjected him to cruel, harsh, and unusual punishment.   Defendant Overmyer did not even reply to some of the DC-ADM-802 appeals and/or the decision by the SCI Forest Grievance Coordinator and from Central Office has been consistent, i.e., placement or continuation on the RRL is not permitted.

128.   Under DOC policy, practice and procedure, once a prisoner is put on the RRL by the Secretary of the DOC, he has absolutely no meaningful avenue in which to file an appeal to challenge the lack of meaningful reviews of his Annual RRL 46 Vote Sheet or the Secretary of the DOC's Annual RRL Reviews to determine whether to continue/remove a prisoner from the RRL.   It is simply an act of futility under DOC policy, practice and procedure for an RRL prisoner to attempt to file appeals that is for all intent and purposes is unavailable and nonexistent.   In enacting the exhaustion of Administrative Remedies provision of the Prison Litigation Reform Act, 42 U.S.C. §1997(e)(a), Congress clearly did not intend or require an inmate to pursue non-existent or

unavailable remedies as a prelude to filing a civil rights lawsuit.

129.   For the foregoing reasons, Johnston has satisfied the requirement that he exhaust all [available] administrative remedies.

## CAUSES OF ACTION

### COUNT I.

130.   Johnston re-alleges paragraphs 18 thorough 130 as if fully stated herein.

131.   Each Defendant, individually and collectively, has violated Johnston's right under the Eighth and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishment by acts and omissions manifesting a deliberate indifference to the deprivation of Johnston's basic human needs for physical health, mental health, environmental stimulation, social interaction, exercise, sleep, and basic human dignity.

132.   All Defendants have violated Johnston's right under the Eighth and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishment by keeping Johnston in conditions of solitary confinement that cause severe pain without penological purpose, and which are grossly disproportionate to any purported governmental interest.

133.   All Defendants have violated Johnston's right under the Eighth and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishment by keeping Johnston in solitary confinement for an extended and unlimited period, and such confinement has caused, and continues to cause, substantial physical and psychological harm to him.

134.   Defendants Overmyer and Oberlander, acting with a sadistic state-of-mind, have violated Johnston's right under the Eighth and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual

punishment be subjecting him to "psychological mind-games" causing him, and continues to cause him, substantial physical and psychological harm, including, inability to eat, weight lose, headaches, sleep insomnia, memory lose, and inability to concentrate.

## COUNT II.

### Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution--Against All Defendants

135.   Johnston re-alleges paragraphs 18 through 130 as if fully stated herein.

136.   All Defendants have violated Johnston's right under the due process clause of the Fourteenth Amendment to the United States Constitution including, but not limited to, by engaging in the following conduct: failing to provide Johnston with a meaningful opportunity to challenge his solitary confinement, including providing him information regarding the basis for any decisions regarding the continuation of his solitary confinement; failing to provide Johnston a meaningful opportunity to be heard in order to challenge his continuing solitary confinement; denying Johnston any opportunity to provide information and/or to influence the ultimate decision-maker regarding his continuing solitary confinement; informing Johnston what is required of him in order for him to be released from solitary confinement; failing to provide Johnston a written rationale setting forth the ultimate decision-makers basis and/or reasons for the Annual RRL Review decisions to continue confining him in solitary confinement on the RRL; failing to provide Johnston with a written rationale setting forth the basis and/or reasons for Defendants Overmyer and Oberlander's recommendations during the routing of the Annual RRL 46 Vote Sheet; Defendant Overmyer and Oberlander providing Johnston with inaccurate and misleading information regarding Defendant Wetzel's July, 2014,

Annual RRL Review decision communicated to SCI Forest officials to do a step down and place Johnston in population; denying Johnston the right to do a step down and be placed in population after the ultimate decision-maker, Defendant Wetzel, in July, 2014, directed SCI Forest officials to do a step down and place Johnston in population; denying Johnston the right to do an accelerated step down to be placed in population after Regional Deputy Secretary Burn's directed SCI Forest to do so, refusing to provide Johnston with any information, including what the decision was, regarding the entire RRL review process.

## COUNT III.

### Substantive Due Process Violation--Against All Defendants

137.    Johnston re-alleges paragraphs 18 thorough 130 as if fully stated herein.

138.    All Defendants have violated Johnston's right to substantive due process under the Fourteenth Amendment to the United States Constitution by continuing to hold him in solitary confinement for more than 17 years without a valid penological or other justification.  Defendants conduct shocks the conscience and does not have a rational basis.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Norman Johnston, requests that the Court grant the following relief:

A.    Declare Defendants' conduct unlawful;

B.    Enjoin and restrain the Defendants from incarcerating
      Johnston in solitary confinement or other similar
      conditions and order Johnston's placement in the general

population;

C.     Mandate that Defendants provide Johnston with proper psychological and mental health services made necessary due to his prolonged solitary confinement;

D.     Award compensatory and punitive damages;

E.     Grant attorneys' fees and costs; and

F.     Such other relief as the Court deems just and proper.


DATED:

November 3, 2016                              Respectfully Submitted,


Norman Johnston, AY-8624
SCI Forest
P.O. Box 945
Marienville, PA 16239

**In pro se**

November 3, 2016


Clerks Office, RM-B-160
U.S. District Court
U.S. Post Office & Courthouse
17 South Park Row
Erie, PA 16501

 RE:  Johnston v. Wetzel, et al.,
   Initial Filing of Civil Rights Complaint

Dear Sir/Madam:

 Please find enclosed for filing with the court are the following documents:

1.  Original Civil Rights Complaint and Five (5) copies;

2.  Signed Consent Form to have U.S. Magistrate Judge Conduct any and all proceedings in this case;

3.  Five (5) USM-285 "Process Receipt and Return Forms" for each defendant to be served;

4.  A Check in the Amount of $400.00 payable to Clerk, U.S. District Court, to cover the $350.00 Filing Fee and $50.00 Administrative Fee.

5.  Pre-addressed postage paid envelope with enclosed "Civil Cover Sheet" to be "stamped" by the Clerks Office and returned to Plaintiff.

 Thanking you in advance for your assistance pertaining to filing the enclosed with the court.


Enclosures:

Civil Rights Complaint (25 pgs.)
Magistrate Judge Consent Form (1 pgs.)
Five USM-285 Forms
$400 Check for fees
Pre-Addressed Envelope

       Sincerely,

       Norman Johnston, AY-8624
       SCI Forest, K-Unit
       P.O. Box 945
       Marienville, PA 16239