IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORMAN JOHNSTON, | ) | |
| | ) | |
| Plaintiff | ) | Case No. 1:16-cv-00268 (Erie) |
| | ) | |
| vs. | ) | |
| | ) | RICHARD A. LANZILLO |
| JOHN WETZEL, SECRETARY | ) | UNITED STATES MAGISTRATE JUDGE |
| OF THE PENNSYLVANIA DOC and | ) | |
| MICHAEL OVERMYER, | ) | |
| SUPERINTENDENT SCI FOREST | ) | MEMORANDUM OF DECISION ON |
| | ) | PLAINTIFF'S MOTION FOR SUMMARY |
| | ) | JUDGMENT; DEFENDANTS' MOTION |
| | ) | FOR SUMMARY JUDGMENT |
| | ) | |
| | ) | ECF No. 46 |
| | ) | ECF No. 50 |

I.    Introduction

The cross-motions for summary judgment filed by Plaintiff Norman Johnston (ECF No. 46) and Defendants John Wetzel and Michael Overmyer (ECF No. 50) present primarily four issues:

- Are Johnston's §1983 claims barred to any extent by the applicable two-year statute of limitations?  The Court holds that they are not.

- Does the 17-year duration of Johnston's conditions of solitary confinement distinguish his case from the otherwise comparable conditions addressed in *Peterkin v. Jeffes*, 855 F.2d 1021 (3d Cir. 1988), such that it is for a jury to determine whether these conditions and their duration violated Johnston's Eighth Amendment right to be free from cruel and unusual punishment? The Court holds that it does and that disputed issues of material fact preclude summary judgment for Johnston or the Defendants on this claim.

- Did Johnston receive meaningful review of his continuing solitary confinement consistent with Fourteenth Amendment due process requirements? The Court holds that disputed issues of material fact remain for trial as to both Defendants' responsibility for a process that a reasonable jury could find to have been pro forma and essentially meaningless.

- Are the Defendants nevertheless entitled to summary judgment on Johnston's Eighth and Fourteenth Amendment claims based on qualified immunity? The Court holds that they are not.[1]

II.     Material Facts

The following factual background is largely undisputed.  Johnston was committed to the Pennsylvania Department of Corrections (DOC) in 1980 following a conviction for homicide. ECF No. 47 ¶ 1.  He is serving a life sentence.  *Id.* at ¶ 2.  While incarcerated at the State Correctional Institution (SCI) at Huntingdon, he escaped from that facility on August 1, 1999. *Id.* at ¶ 3.  Johnston was apprehended twenty days later, re-incarcerated at SCI-Camp Hill, and placed in solitary confinement.[2]  As a consequence of his escape attempt, Johnston was placed on disciplinary status and kept in solitary confinement for eighteen months.  *Id.* at ¶ 7.  He remained so confined even after the conclusion of this eighteen-month period, until February of 2005, when he was transferred to SCI-Forest.  *Id.* at ¶¶ 8-9.  During his incarceration at SCI-

---

[1] Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of a United States Magistrate Judge to conduct proceedings in this case, including the entry of a final judgment. ECF Nos. 8, 10.

[2] Johnston uses the term "solitary confinement" to describe his confinement.  The Defendants instead describe Johnston's confinement as Administrative Custody within the Restrictive Housing Unit.  *See, e.g.*, ECF No. 62, ¶ 6. The Court's focus is on the specific conditions of Johnston's confinement rather than their label and will use the parties' respective labels interchangeably.  *See, e.g., Williams v. Secretary, Department of Corrections*, 848 F.3d 549, 575 (3d Cir. 2017) (using terms "solitary confinement" and "administrative custody" interchangeably).

Camp Hill, Johnston was confined to a cell measuring approximately sixty square feet. Johnston remained in solitary confinement for approximately six years at that institution.[3] *Id.* at ¶ 14.

Upon his transfer to SCI-Forest in 2005, Johnston was immediately placed in solitary confinement and housed in a cell that measured ninety-one square feet, but which provided only fifty-six square feet of practical space. *Id.* at ¶ 12. This cell had one narrow, five-inch window. *Id.* at ¶ 27. Johnston was isolated in this cell for twenty-three hours per day, seven days per week, for approximately eleven years. *Id.* at ¶ 14. His cell also contained a light fixture that he claims was left on twenty-four hours a day.[4] *Id.* at ¶ 30. Johnston ate meals alone, was prohibited from speaking with other inmates, and only permitted to shower three times each week. *Id.* at ¶ 31-32. He was given visitation privileges once a week and had to conduct visits through a glass partition. *Id.* at ¶ 33-34.

Johnston was allowed time in an "exercise cage" five days per week for one hour from 2005 until 2012. *Id.* at ¶ 15. Starting in 2012, he was permitted two hours in the exercise cage. *Id.* This cage measured seventy-five square feet and Johnston was not permitted access to any exercise equipment. *Id.* Access to this outdoor facility was withheld during inclement weather. *Id.* at ¶ 18. Johnson was not issued a single misconduct after April 7, 2013. *Id.* at ¶ 36. Approximately four months after filing this action, Johnston was released from solitary confinement, marking approximately seventeen years in solitary confinement. *Id.* at ¶ 43.

Between 2003 and 2005, the DOC instituted a program under which it placed certain inmates on a "Restricted Release List" or "RRL." Placement on the RRL meant that the inmate

---

[3] Defendants have denied this statement, because it was not supported by citations to the record. *See* ECF No. 62, ¶ 14.

[4] Defendants profess a lack of knowledge regarding the identity of the light fixture to which Johnston is referring and dispute that the light fixture remained on twenty-four hours a day. EFC No. 62, ¶ 30.

would be subjected to indefinite solitary confinement.[5] *See Johnson v. Wetzel*, 209 F. Supp. 3d 766, 772 (M.D. Pa. 2016). Only the Secretary of the DOC could authorize the release of an inmate on the RRL to re-enter the general prison population. *Id. See also* ECF No. 53-7, p. 16 (Wetzel Deposition). Without the Secretary's express authorization, the inmate would remain indefinitely in solitary confinement. ECF No. 53-7, p. 39. Until 2012, the DOC Secretary did not review the inmate's status on the RRL unless the facility's Superintendent and Deputy Superintendent, along with the Regional Deputy Secretary and Executive Deputy Secretary, unanimously agreed that the inmate should be released from the RRL. *Id.*; *see also Johnson*, 207 F. Supp. 3d. at 772.

In or around 2012, the policy changed to include the Secretary's annual review of an inmate's status on the RLL. Since 2012, as to each RLL inmate, the Secretary annually receives a "vote sheet" that records a vote in favor or against release from solitary confinement and possible comments from the Superintendent and the Deputy Superintendent of the inmate's facility as well as from the Regional Deputy Secretary and the Executive Deputy Secretary. Following receipt of the vote sheet, the Secretary, as the sole decisionmaker, then determines whether an inmate will remain on or be removed from the RRL. *Id.* at pp. 41, 43. Between April 7, 2003 and the present, Johnston was not cited for misconduct or disciplined for any reason. The only concern ever expressed by a prison official in support of continuing his status on the RLL that he was "dangerously manipulative, simply by being so nice and polite all the

---

[5] The process for removal from the RRL is governed by the DOC 802 Administrative Custody Procedures which states: (1) An inmate on the RRL list may not be released from Security Level 5 housing without the written approval of the Secretary; (2) The PRC may make a recommendation to the Facility Manager if they believe an inmate on the RRL could be safely released to the general population; (3) The Facility Manager passes his recommendation to the Regional Deputy Secretary, who passes his recommendation on to the Executive Deputy Secretary, along with a current psychological evaluation; (4) The Executive Deputy Secretary makes her recommendation and forwards the removal request form to the Secretary of the DOC for final determination. DOC 802, Section 4(b). The Secretary is the sole and final decision-maker as to whether a prisoner is placed on the RRL and whether the prisoner remains on or is removed from the RRL. *Id.*

time." (2016 Vote Sheet). Despite this assessment and no meaningful change in circumstances since it was made, Johnston was released to General Population at SCI-Forest on March 13, 2017.[6] ECF No. 52, ¶114.

III.     Procedural History

Johnston initiated this action pro se on November 7, 2016. ECF No. 1. His Complaint alleged that the conditions and duration of his confinement violated the Eighth Amendment's prohibition against cruel and unusual punishment and that the absence of any meaningful means to challenge that confinement violated his right to due process of law under the Fourteenth Amendment. *Id.* Attorney John F. Mizner entered his appearance on Johnston's behalf on March 1, 2017. ECF Nos. 11, 12.

On May 20, 2019, following a lengthy period of discovery, this Court approved the stipulated dismissal of several defendants. ECF No. 45. John Wetzel, Secretary of the DOC, and Michael Overmyer, Superintendent of SCI-Forest, are now the sole remaining defendants in this action. Both Johnston and Defendants Wetzel and Overmyer filed cross-motions for summary judgment, supporting briefs and concise statements of material facts on May 21, 2019. ECF Nos. 46, 47, 48; ECF Nos. 50, 51, 52. Each filed a response to the opposing party's concise statement of material facts. *See* ECF Nos. 59, 60, 61, 62. The parties' cross-motions for summary judgment are appropriate for simultaneous disposition. *See Swanberg v. PNC Fin. Servs. Grp., Inc.* 2016 WL 4493684, at *10 (W.D. Pa. Aug. 26, 2016).

---

[6] Johnston's release to General Population came approximately one month after the U.S. Court of Appeals for the Third Circuit issued its decision in *Williams v. Secretary Pennsylvania Dep't of Corrections*, 848 F.3d 549, 558-59 (3d Cir.) *cert. denied sub nom. Walker v. Farnan*, 138 S. Ct. 357, 199 L. Ed. 2d 263 (2017), and cert. denied sub nom. *Williams v. Wetzel*, 138 S. Ct. 357, 199 L. Ed. 2d 263 (2017) (discussed *infra* at pp. 21-25), and approximately four months after Johnston filed this action.

IV.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must to go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

The court applies the foregoing standards no differently when reviewing cross-motions for summary judgment. *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). "'Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Id.* (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). If review of cross-motions reveals no genuine issue of material fact, then judgment may be granted in favor of the party entitled to judgment in view of the law and undisputed facts. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

V.     Analysis and Discussion

Johnston argues that the Defendants violated the Eighth Amendment's prohibition against cruel and unusual punishment by keeping him in solitary confinement for more than seventeen years and that the Defendants also denied him his Fourteenth Amendment due process rights by offering him no meaningful procedure or process to challenge his confinement conditions. The Defendants raise several arguments in opposition to Johnston's claims, including that Johnston's

claims are barred by the applicable statute of limitations, the record is insufficient to support a claim under either the Eighth or Fourteenth Amendment, and that the Defendants are—in any event—entitled to qualified immunity for any constitutional violation.

### A. Statute of Limitations

Johnston commenced this action on November 7, 2016. Defendants contend that the statute of limitations bars Johnston's claim under 42 U.S.C. § 1983, at least to the extent he seeks relief for injury that occurred prior to November 7, 2014, two years prior to his filing date. Because § 1983 provides no independent statute of limitations, federal courts look to the most analogous limitations period of the forum state. *Dique v. New Jersey State Police*, 603 F.3d 181, 185 (3d Cir.2010) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)). The United States Court of Appeals for the Third Circuit has determined that the Pennsylvania state law claim most analogous to a § 1983 claim is a personal injury action, which is subject to the Commonwealth's two-year statute of limitations under 42 Pa. Cons. Stat. Ann.§ 5524. *Sameric Corp. of Delaware, Inc. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1988); *Kost v. Kozakiewicz*, 1 F.3d 176, 190 (3d Cir. 1993). For purposes of calculating the two-year limitations period, a § 1983 cause of action typically accrues, and the statute of limitations commences to run, "when the plaintiff knew or should have known of the injury upon which [his] action is based." *Sameric*, 142 F.3d at 599. Defendants argue that Johnston was aware of the conditions of his solitary confinement for well more than two years before he filed his lawsuit. Johnston counters that the "continuing violation" doctrine tolled or extended the limitations period on his claims.

The continuing violation doctrine is an "equitable exception to the timely filing requirement" that applies "when a defendant's conduct is part of a continuing practice." *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995) (*superseded in part by statute, Lilly Ledbetter*

*Fair Pay Act*, Pub. L. No. 111-2, 123 Stat. 5 (2009)).  This doctrine allows untimely actions to be considered timely "so long as the last act evidencing the continuing practice falls within the limitations period" by instructing the court to "grant relief for the earlier related acts that would otherwise be time barred."  *Brenner*, 927 F.2d at 1295.  The Court of Appeals for the Third Circuit has held that "[t]o prevail on a continuing violation theory, however, the plaintiff must show more than the occurrence of isolated or sporadic acts ...."  *Jewett v. Int'l Tel. and Tel. Corp.*, 53 F.2d 89, 91 (3d Cir. 1981).  A "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation."  *Sandutch v. Muraski*, 684 F.2d 252, 254 (3d Cir. 1982) (quoting *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981)), *abrogated on other grounds by Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997).

The Court should consider three factors when determining whether a defendant's acts constitute a continuing practice or sporadic incident: (1) subject matter jurisdiction-whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency-whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence-whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.  *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001).  The consideration of the "degree of permanence" is the most important factors to consider.  *Id.*

Here, Johnston has not alleged a series of distinct wrongs but rather he has claimed that Defendants' conduct is part of a continuing seventeen-year practice of unconstitutionally restricting him to solitary confinement.  The rationale underlying the continuing violation doctrine applies to this type of claim.  *Shoatz*, 2016 WL 595337, *3.  Because Johnston filed suit

within two years of his release from solitary confinement, he is entitled to challenge all conduct that was a part of that alleged violation of his rights, even conduct that occurred outside the limitations period.[7] *Id.*

### B. Qualified Immunity

The Defendants challenge the sufficiency of the record to support Johnston's Eighth Amendment and Fourteenth Amendment claims. Alternatively, they argue that qualified immunity shields them from liability on both claims. Johnston argues that the record establishes each of his claims as a matter of law and that neither Defendant is entitled to qualified immunity. Because an assessment of the legal sufficiency of the constitutional claims is an element of the qualified immunity analysis, the Court will address the viability of Johnston's claims in the context of qualified immunity.

Qualified immunity "shield[s] [government actors] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (alterations in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When the material facts are not in dispute, the district court may decide whether a government official is shielded by qualified immunity as a matter of law." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 n.6 (1987).

---

[7] In the heading preceding their statute of limitations argument, Defendants' brief stated as an alternative basis for dismissal "Plaintiff failed to satisfy the Prison Litigation Reform Act's exhaustion requirement with respect to these claims." ECF No. 51, p. 4. However, they did not argue exhaustion in their brief and, in any event, the Court finds the assertion to be without merit. "PLRA exhaustion turns on the remedies and grievance procedures that the particular prison has available." *Rinaldi v. United States*, 904 F.3d 257, 272 (3d Cir. 2018). Here, Johnston had no remedies or grievance procedures to challenge his solitary confinement. *See* ECF No. 1, ¶ 62. Defendants admit that an inmate on the RRL had no process to challenge the Secretary's decision to continue his solitary confinement. ECF No. 8, ¶ 62. Exhaustion is not required where, as here, there are no remedies available to exhaust. *See Ross v. Blake*, --- U.S. ---, 136 S. Ct. 1850, 1858 (2016) (quoting 42 U.S.C. § 1997e(a)) (holding that "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.").

The Supreme Court has mandated a two-step process for resolving issues of qualified immunity. First, "a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the plaintiff has satisfied this first step, the court must next decide "whether the law clearly established that the [defendant's] conduct was unlawful in the circumstances of the case" at the time of defendant's alleged misconduct. *Id.* In *Mann v. Palmerton Area Sch. District*, our Court of Appeals emphasized that the "clearly established" prong of the qualified immunity inquiry must be analyzed "at the appropriate level of specificity." 872 F.3d 165, 173 (3d Cir. 2017). In other words, qualified immunity is only denied where factually similar precedent exists that would have placed the defendant on notice that his specific conduct was constitutionally unlawful. *Id.* (noting that a court must "frame the right at issue in a more particularized, and hence more relevant, sense, in light of the case's specific context, not as a broad general proposition.") (quoting *Spady v. Bethlehem Area Sch. District*, 800 F.3d 633, 638 (3d Cir. 2015)).

Although the Supreme Court has instructed that the two steps of the qualified immunity analysis need not be addressed in sequential order, *see Pearson v. Callahan*, 555 U.S. 223, 231 (2009), courts often find it efficient first to consider the legal sufficiency of the plaintiff's constitutional claim before addressing whether the right at issue was clearly established at the time of the defendants' actions. *See Jones v. Walsh*, 2018 WL 1203472, at *4 n.4 (D.N.J. Mar. 8, 2018) (citing *Saucier*, 533 U.S. at 201) ("Because the first step of a qualified-immunity analysis is to examine whether the plaintiff has sufficiently alleged that the defendant violated a constitutional or statutory right, that question overlaps with the issue of whether the plaintiff has stated a claim under § 1983").

1.    The Record Supports Johnston's Eighth Amendment Conditions of
      Confinement Claim.

Johnston claims that the conditions of confinement to which he was subjected over a

seventeen-year period violated the Eighth Amendment's prohibition against cruel and unusual

punishment. The Supreme Court has "interpreted this prohibition . . . to impose affirmative

duties on prison officials to 'provide humane conditions of confinement.'" *Young v. Martin*, 801

F.3d 172, 177 (3d Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 835, 832 (1994)). To

succeed, Johnston must satisfy both an objective and a subjective element of the claim. First, he

must establish that the Defendants' conduct was "objectively harmful enough or sufficiently

serious to violate the Constitution." *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018) (internal

citations omitted). To meet the subjective component of this claim, Johnston must show that the

Defendants were deliberately indifferent to those conditions by acting with a reckless disregard

of a known risk of harm. *Wilson v. Seiter*, 501 U.S. 294, 298-303 (1991); *Watson v. Sec'y Penn.

Dep't of Corr.*, 567 Fed. Appx 75, 79 (3d Cir. 2014). So "the [prison] official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw that inference." *Farmer*, 511 U.S. at 837.

a.    The Objective Element

Based upon the summary judgment record, the Court finds that a reasonable jury could

conclude that Johnston's conditions of confinement were objectively harmful enough to

constitute a constitutional violation. The facts, however, are not so clear and free from doubt to

support judgment for Johnston as a matter of law as he requests in his motion for summary

judgment.

The detrimental effects of prolonged solitary confinement on prisoners have been well

documented. *See, e.g., Reforming Restrictive Housing: The 2018 ASCA-Liman Nationwide*

*Survey of Time-in-Cell*, Yale Law School 2018; Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. of the Am. Acad. of Psychiatry and the Law Online 104 (2010); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. Univ. J. of Law & Policy 325 (2006); Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime and Justice 441 (2006). Citing this "robust body of scientific research on the effects of solitary confinement," the U.S. Court of Appeals for the Third Circuit has noted the "scientific consensus" that such isolation "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage." *Williams v. Sec'y Penna. Dep't of Corr.*, 848 F.3d 549, 566-67 (3d Cir. 2017). Two months after its decision in *Williams*, the Court of Appeals noted that prolonged incarceration in solitary confinement "can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identify." *Palakovic v. Wetzel* 854 F.3d 209, 225-26 (3d Cir. 2017) (citing *Williams*, 848 F.3d at 566-67). Citing the "studies [which] have documented high rates of suicide and self-mutilation amongst inmates who have been subjected to solitary confinement," the Court of Appeals additionally recognized that physical harm to inmates can result from protracted isolation. *Id*. at 226.

Other courts throughout the nation have similarly recognized the potential adverse effects of solitary confinement. Indeed, the Supreme Court, more than a century ago, observed, that when housed in isolation, "a considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the

ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." *In re Medley*, 134 U.S. 160, 168 (1890). *See also Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019) (quoting *Medley*). More recently, several Supreme Court justices have noted the serious harms confinement in isolation inflicts on inmates. *See Apodaca, et al. v. Raemisch*, --- U.S. ---, 139 S. Ct. 5, 6 (2018) (Sotomayor, J., dissenting from denial of certiorari); *Ruiz v. Texas*, --- U.S. ---, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting from denial of stay of execution); *Glossip v. Gross*, --- U.S. ---, 135 S. Ct. 2726, 2765 (Breyer, J., dissenting); *Davis v. Ayala*, --- U.S. ---, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring).

Here, Johnston's seventeen years of solitary confinement deprived him of, at a minimum, exercise, sleep, social contact and interaction, and environmental stimulation. ECF No. 48, p. 8. These items have been recognized in a wide variety of cases as basic human needs. *See, e.g., Wilson*, 501 U.S. at 340 (exercise); *Conway v. Cty. Of Camden*, 2017 WL 3783263, *3 (D.N.J. Aug. 31, 2017) (sleep); *Shoatz v. Wetzel*, 2016 WL 595337, *8 (W.D. Pa. Feb. 12, 2016) (social interaction and environmental stimulation). For seventeen years, Johnston's existence was limited to approximately sixty square feet of space, where he was confined twenty-three hours per day, seven day per week. He was permitted to go outdoors where he was confined to a cage for one hour each day during weekdays. After 2012, he was granted an extra hour of outdoor time. When the weather was inclement, he was confined to his cell twenty-four hours a day. Even when available, Johnston often did not avail himself of his permitted outdoor time because of conditions he had to endured in doing so. As his expert witness, Dr. Stuart Grassian, explained:

> There were other deterrents against going out to exercise. For one thing, he was strip searched every time he left his cell. For

another, there was a great deal of chaos in the tier. Out in their separate cages, some inmates would throw cups of feces at each other through the openings in the chain link fence separating the cases. At times, Mr. Johnston was placed in a cage between two inmates who were very likely to engage in this behavior – and he would be in the middle between them. He took to seeing who was going out before deciding whether he would do so.

ECF No. 46-2, 30-31.

Johnston's "primary view of the world" was through a small window that was later equipped with blinds to let the light in but prevent Johnston from seeing anything. *See, e.g., Johnson*, 209 F. Supp. 3d at 777. He had no contact or interaction with other inmates and no physical contact with visitors. In fact, except for incidental contact with corrections officers, Johnston had no physical contact with any other person for the duration of his stay in solitary confinement. Johnston's prolonged solitary confinement also caused him to suffer from cognitive impairment, chronic depression, emotional pain and suffering, and other psychological harms. ECF No. 48, p. 8-9.

The Court is mindful of the cases holding that solitary confinement "does not, in itself, violate the Constitution," and isolation "may be a necessary tool of prison discipline." *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 777, 780 (W.D. Pa. 2016) (citing *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992), *superseded on other grounds by statute*, Prison Litigation Reform Act, 42 U.S.C. § 1997, et seq.). In *Peterkin v. Jeffes*, for example, the Court of Appeals for the Third Circuit examined conditions of solitary confinement in Pennsylvania correctional institutions comparable to those at issue in this case and held that they did not contravene the Eighth Amendment. 855 F.2d 1021, 1031 (3d Cir. 1988). There, the challenged conditions of confinement included 1) twenty-two or twenty-three hours of confinement in a cell per day; 2) limiting all activities (eating, sleeping, toileting, etc.) to the cell; 3) small cell size; 4) permitting

showers only three times each week; 5) prohibiting physical contact with visitors; 5) access only

to a small, outdoor caged activity area; and 6) no access to activities permitted prisoners in

general population, including counseling. *Id.* at 1022. In holding that these conditions did not

violate the Eighth Amendment, the Court emphasized:

> The primary responsibility for operating prisoners belongs
> to the prison administrators, to other state law enforcement
> officials and to the state legislature. The Eighth
> Amendment does not authorize a federal court to second
> guess their decisions nor is it our role to express our
> agreement or disagreement with their overall policy or
> theories of prison administration, as long as we find no
> constitutional violation.

*Id.* at 1032-33.

Unlike this case, however, the duration of the confinement was not at issue in *Peterkin*

and the Supreme Court has instructed that the duration of confinement "cannot be ignored" in

determining whether challenged conditions withstand constitutional scrutiny. *Hutto v. Finney*,

437 U.S. 678, 686 (1978). While no bright line exists to say when the duration of solitary

confinement contravenes the Eighth Amendment, Johnston's seventeen-years align his case

much closer to those finding a viable Eighth Amendment violation than those cases rejecting the

claim. *Compare Williams,* 848 F.3d at 566-67 (twenty-two years in solitary confinement) *with*

*Stanford v. Walton*, 2019 WL 5068666 (W.D. Pa. Oct. 9, 2019) (four weeks in insolation).

Johnston's uninterrupted seventeen years of solitary confinement subjected him to conditions

sufficiently serious and detrimental that a reasonable jury could find a violation of his right to be

free from cruel and unusual punishment. *See Johnson*, 209 F. Supp. 3d at 777; *Wilson*, 501 U.S.

at 304; *see also Shoatz*, 2016 WL 595337, at *7–8; *Ashker*, 2013 WL 1435148, at *4–6;

*Wilkerson*, 639 F. Supp. 2d at 677–78.

b.    Subjective Element

The second element of Johnston's Eighth Amendment conditions of confinement claim requires that he show that the Defendants were deliberately indifferent to the prison conditions that caused his constitutional injury. *Farmer*, 511 U.S. at 833; *Wilson*, 501 U.S. at 297; *Rhodes*, 452 U.S. at 347. To sustain this element, the record must support a finding that, subjectively, the officials acted with a sufficiently culpable state of mind. *Id.* The Supreme Court has explained:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ... The Eighth Amendment does not outlaw cruel and unusual "conditions;" it outlaws cruel and unusual "punishments."

*Farmer*, 511 U.S. at 838. Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. A trier of fact may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious. *Id.* at 842. The Supreme Court further clarified in *Hope v. Pelzer*, 536 U.S. 730, 738 (2002), that courts also "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."

Defendants acknowledge that they were aware of Johnston's solitary confinement and the general conditions of that confinement, but they argue that the record is inadequate to support a finding that either of them believed that these conditions were harming Johnston to the point of an Eighth Amendment violation. The Court finds that genuine issues of material fact remain for trial regarding the extent of Wetzel's knowledge of the adverse effects Johnston was experiencing as a result of his prolonged isolation.

The record demonstrates that Wetzel was aware of the risks inherent in prolonged solitary confinement in general and that he was specifically aware of Johnston's situation. For example, Wetzel admitted to being familiar with the body of literature describing the negative effects of long-term solitary confinement. ECF No. 53-7, at 72. He also testified at his deposition that he knew of Dr. Grassian's research on the subject and that he had talked about Grassian's findings and conclusions with other doctors and professionals. *Id.* at 72-73. Additionally, the Secretary was named as a defendant in numerous other lawsuits in which courts recognized the negative impact of solitary confinement. *See, e.g., Palakovic v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017) (noting the "increasingly obvious reality that extended stays in solitary confinement cause serious damage to mental health."); *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 777 (M.D. Pa. 2016); *Shoatz v. Wetzel*, 2016 WL 595337 (W.D. Pa. Feb. 12, 2016). Wetzel possessed this while Johnston was confined to isolation. Given Wetzel's position as DOC Secretary, his status as a corrections professional, and his own admissions, it would "defy logic" to conclude that he was unaware of the harm caused to Johnston by prolonged incarceration in solitary confinement. *See Porter v. Clark,* 290 F. Supp. 3d 518, 532 (E.D. Va. 2018), *aff'd*, 923 F.3d. 348 (4th Cir. 2019); *see also Shoatz*, 2016 WL 595337, *4 n.3 (recognizing that a conclusion that "prolonged isolation from social and environmental stimulation increases the risk of development of mental illness does not strike this court as rocket science."); *Wilkerson*, 639 F. Supp. 2d at 380 ("[a]ny person in the United States who reads or watches television should be aware that lack of adequate exercise, sleep, social isolation, and lack of environmental stimulation are seriously detrimental to a human being's physical and mental health.").

Similarly, as the prison Superintendent and a member of the Program Review Committee (PRC), Overmyer personally interacted with and observed Johnston and voted against his release

from the RRL in 2014 and 2015. Although Wetzel had the ultimate decision-making authority regarding Johnston's release, Overmyer's personal involvement in the asserted violation is enough to deny him summary judgment on Johnston's claim.

In sum, the Court holds that genuine issues of material fact remain for trial and preclude summary judgment as to viability of Johnston's Eighth Amendment claim against Wetzel and Overmyer. Accordingly, the Court will proceed to analyze whether the right asserted by Johnston was clearly established at the time the Defendants acted in this case.

> 2. Johnston's factually specific Eighth Amendment right was clearly established.

As our Court of Appeals recognized in 1992, solitary confinement, while alone not seen as cruel and unusual, will become so when it is combined with other conditions that unreasonably threaten the physical or mental health of an inmate:

> Segregated detention is not cruel and unusual punishment per se, as long as the conditions of confinement are not foul, inhuman or totally without penological justification. (internal citations omitted) .... Courts, though, have universally condemned conditions of segregation inimicable to the inmate-occupants' physical health, and, in some instances, have also considered conditions that jeopardize the mental health or stability of the inmates so confined. The touchstone is the health of the inmate. While the prison administration may punish, it may not do so in a manner that threatens the physical and mental health of prisoners.

*Young v. Quinlan*, 960 F.2d 351, 363-64 (3d Cir. 1992), *superseded by statute on other grounds as stated in Ghana v. Holland*, 226 F.3d 175, 184 (3d Cir. 2000) (citing *Hutto v. Finney*, 437 U.S. 678, 685-87 (1978); *Peterkin v. Jeffes*, 855 F.2d 1021, 1029-30 (3d Cir. 1988)). Years earlier, in 1978, the Supreme Court instructed that "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." *Hutto*, 437 U.S. at 686.

"For a right to have been 'clearly established,' 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Williams*, 848 F.3d at 570 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). This standard does not, however, require a perfect match between "the facts of the existing precedent" and "the circumstances of the dispute in which the question arises." *Id.* "'[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The principles and factual correspondence of cases such as *Young* and *Hutto* adequately placed Wetzel and Overmyer on notice that Johnston's conditions of confinement, including the extended duration of his solitary confinement, and the asserted effects of that confinement upon him, violated the Eighth Amendment. Accordingly, the Court finds that the summary judgment record, when viewed in the light most favorable to Johnston, raises genuine issues of material fact as to whether the Defendants violated his clearly established Eighth Amendment rights by acting with deliberate indifference to the recognized mental and physical health risks of long term solitary confinement.

   3.    The Record Supports Johnston's Fourteenth Amendment Procedural Due
         Process Claim against Wetzel.

Johnston contends that Wetzel and Overmyer violated his procedural due process rights under the Fourteenth Amendment by failing to provide him with any meaningful review or opportunity to be heard in opposition to his seventeen-year detention in solitary confinement. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In analyzing a procedural due process claim, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth

Amendment." *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000). If the asserted interest falls within the protections of the Due Process Clause, the second step is to determine whether the plaintiff was afforded "all of the process he was due." *Id.* The Court begins then with the threshold question whether Johnston has asserted a liberty interest sufficient to trigger due process protections.

Liberty interests arise from the Constitution or "from an expectation or interest created by state laws." *Williams v. Sec'y, Dep't. of Corr.*, 848 F.3d 549, 558-59 (3d Cir. 2017) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In the prison context, a protected liberty interest arises only where a restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Williams v. Secretary Pennsylvania Dep't of Corrections*, 848 F.3d 549, 558-59 (3d Cir.) *cert. denied sub nom. Walker v. Farnan*, 138 S. Ct. 357, 199 L. Ed. 2d 263 (2017), *and cert. denied sub nom. Williams v. Wetzel*, 138 S. Ct. 357, 199 L. Ed. 2d 263 (2017) (emphasis in original) (citations omitted). In determining whether a condition of confinement creates a protected liberty interest, a court must consider: "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000). *See also Williams*, 848 F.3d at 560 (quoting *Shoats*); *Powell v. Weiss*, 757 F.3d 338, 346 (3d Cir. 2014) (noting that *Shoats* is the governing standard). Employing that two-step inquiry in *Shoats*, the Court of Appeals determined that an eight-year term in solitary confinement created a protected liberty interest. *Shoats*, 214 F.3d at 144.

In *Williams*, the Third Circuit examined the "robust body of scientific research on the effects of solitary confinement" and concluded that indefinite exposure to isolated confinement causes "deep and long-term psychic harm" and "poses a grave threat to well-being." *Id.* at 566.

Because such harm "is the essence of the atypical and significant hardship inquiry," the Court held that the plaintiffs, each of whom had been indefinitely confined on death row for several years after their death sentences had been overturned, possessed a "due process right to be free from indefinite conditions of solitary confinement." *Id.* at 566, 574-75.

Notably, the Third Circuit did not pronounce that any and every exposure to solitary confinement violates the Constitution. Such a holding would have run afoul of the United States Supreme Court's prior decision in *Sandin v. Conner*, 515 U.S. 472 (1995), in which the Court held that a thirty-day stay in solitary confinement did not give rise to a protected liberty interest. *Id.* at 486-87. Rather, the Third Circuit held that inmates have a clearly established Fourteenth Amendment right to avoid unnecessary, unexamined, and indefinite solitary confinement. *Williams*, 848 F.3d at 574. As the Court of Appeals explained:

> Here, as in [*Wilkinson v. Austin*, 545 U.S. 2009 (2005)] and *Shoats*, Plaintiffs' placements on death row were indefinite. In *Wilkinson*, "placement at [the Supermax] is for an indefinite period of time, limited only by an inmate's sentence. For an inmate serving a life sentence, there is no indication how long he may be incarcerated ... once assigned there." .... Plaintiffs could not even hope to be released based on prison PRC review because these pro forma assessments did not consider the necessity of their severe conditions of confinement.

> \*\*\*

> This indefiniteness contrasts sharply with other common forms of solitary confinement, such as the punitive segregation that is discussed in *Sandin*. The duration of the deprivations that follow from that seclusion is often predetermined and fixed unless the inmate's behavior is thought to require an additional period of segregation.

*Id.* at 562.

Like the unexamined and indefinite solitary confinement addressed in *Williams*, Johnston's seventeen-year stint in solitary confinement was not finite or fixed in duration.

Instead, the record indicates that its end was more likely precipitated by the *Williams* decision or the filing of this lawsuit than any natural term or meaningful review. While his status was subject to annual review after 2012, the record supports that each review was pro forma at best, and, on this record, may not have considered any valid penological purpose for continuing Johnston in solitary confinement. While his initial eighteen-month commitment to solitary confinement was precipitated by an acute incident—his successful escape—the Defendants did not relate his subsequent years-long continuation in solitary confinement to this or any other misconduct.

In *Williams*, the Third Circuit explicitly distinguished solitary confinement as a disciplinary sanction from indefinite segregation. *See Williams*, 848 F.3d at 562 (noting that indefinite solitary confinement "contrasts sharply with other common forms of solitary confinement, such as ... punitive segregation"). *See also Sandin*, 515 U.S. at 485-86 (holding that a finite period of solitary confinement for disciplinary purposes "does not present a dramatic departure from the basic conditions of [plaintiff's] indeterminate sentence"). The record establishes that Johnston, with one exception, did not receive any misconducts or other reprimands that might explain his continued confinement. And, according to the Complaint, he has also been subjected to more restrictive conditions, *i.e.*, the sealing of the steel doors of his cell and the "no talking" policy. *See* Complaint at ¶¶ 37–38. Thus, the duration of his confinement was longer and the conditions harsher than that of the inmate in *Shoats.*

Further, the conditions of Johnston's solitary confinement were significantly harsher than those imposed on the general inmate population. *See Williams*, 848 F.3d at 561. As noted, for seventeen years, Johnston was confined to a small space with limited to no access to exercise and the outdoors; he was required to eat his meals alone in his cell; he was prohibited from

23

showering more than three times a week. His visitation privileges were severely limited as compared with those of other inmates. Johnston was not permitted to participate in any of the institution's educational, recreational, or vocational programs. And he was not provided any meaningful avenue to challenge his confinement. The Court concludes that these deprivations departed significantly from the normal hardships of prison life and thereby triggered a protected liberty interest under the Fourteenth Amendment.

Having concluded that Johnston's protracted solitary confinement implicated his right to due process, the question becomes whether he received the process to which he was due under the Constitution. In support of their position that he did, Defendants rely primarily upon the Third Circuit's decision in *Shoats v. Horn*, which held that although the plaintiff had "a protected liberty interest that ha[d] been adversely affected by his indefinite segregation in administrative custody," he had not "been deprived of the process he is due under the Fourteenth Amendment." 213 F.3d 140, 144 (3d Cir. 2000). *Shoats*, however, does not provide the blanket approval of the DOC practices that the Defendants suggest in their brief. ECF No. 51, p. 25-26. The Third Circuit has clarified its holding on that very point, writing:

> The review that we found adequate in *Shoats* is not an inconvenient ritual intended to shelter officials from liability so that they may mechanically continue an inmate's confinement …. Rather, such inmates have a right to regular and meaningful review of their continued placement on death row. In conjunction with periodic review, to ensure the review is meaningful, this process must include a statement of reasons for the continued placement on death row. Inmates must also have a meaningful opportunity to respond to the reasons provided. These procedures would be of little value absent the attendant right of a hearing. Without such protections, the Constitution's guarantee of due process would be "a tale … full of sound and fury, signifying nothing." As Justice Kennedy has explained, this would leave individuals

24

> vulnerable to erroneous and unjustifiable infliction of
> "[y]ears on end of near-total isolation" at "a terrible price."

*Williams*, 848 F.3d at 575-76, (emphasis added). As *Williams* makes clear, the due process analysis in this context is fact-specific, and the facts of this case are distinguishable from those in *Shoats*. Here, the record falls short of establishing as a manner of law that Johnston's protracted solitary confinement received meaningful review. Indeed, on the existing record, a jury could reasonably find that the reviews that occurred were pro forma and meaningless. This conclusion is bolstered by the absence of meaningful criteria to guide Wetzel's decision on whether to continue an inmate on the RRL and any meaningful opportunity for the inmate to be heard on this issue.

Although a closer call, the Court finds that the record also supports Johnston's due process claim against Overmyer. As the Court previously discussed, a reasonable jury ultimately may find that the process of reviewing Johnston's prolonged and indefinite solitary confinement was pro forma and meaningless. Overmyer participated directly in that process. It is true that Wetzel was the sole decision maker regarding whether Johnston would be removed from the RRL. Nevertheless, Overmyer's involvement in the process was significant enough to sustain a viable claim against him.

Having concluded that the summary judgment record adequately supports Johnston's due process claim against both Wetzel and Overmyer, the Court will turn to whether qualified immunity shields them from suit on this claim. In *Williams*, the Court made "clear what prison officials should have already known: those no longer subject to the death penalty ... have a due process right to be free from indefinite conditions of solitary confinement." *Williams*, 848 F.3d at 574–75 (quoting Plaintiffs' Supp. Br. at 4). The Court so proclaimed on February 9, 2017, a little more than a month before Johnston was released to General Population. The facts and

circumstances of the present case differ from those underlying the *Williams* decision. Here, Johnston was never subject to the death penalty; his initial placement in solitary confinement was based upon his escape in 1999. This distinction does not appear to be material. What is more significant is that at least since 2012, a process ostensibly existed to review Johnston's continuation on the RRL. While acknowledging the existence of this process, Johnston has proffered evidence from which a jury may find that the Defendants exercised their roles in the process in a manner that rendered it meaningless. At the same time, Defendants do not genuinely dispute that the process did not afford Johnston a meaningful opportunity to be heard and challenge his continuation on the RRL.

Johnston has presented enough evidence to preclude dismissal of his due process claim based upon qualified immunity. Johnston is not claiming a liberty interest because he was placed on the RRL. Nor is he making a facial challenge to DOC policy. Rather, as he explains, Johnston raises an as applied challenge to the deprivation of his liberty interest through the failure to provide notice and a meaningful opportunity to be heard and challenge his prolonged solitary confinement and to the "conscience-shocking" decisions to continue him in solitary confinement for an exceptionally long period of time without providing sufficient procedural protections.

As the Court noted previously, since 2000, the Court of Appeals has determined that  eight years in administrative custody, where, for example, an inmate is confined to his cell for 23 hours each day, eats meals by himself, and is prohibited from participating in organization activities, is atypical and implicates a protected liberty interest. *Shoats,* 213 F.3d at 144. The Third Circuit also held that an "informal, nonadversary review at which the prisoner has the opportunity to state his views satisfies the requires of due process." *Id.* (quoting *Hewitt v.*

26

*Helms*, 459 U.S. 460, 476 (1983)). Further, based on the current record, the Court cannot say as a matter of law that Johnston's long-term solitary confinement was based upon security or other legitimate penological considerations, and not punitive. The procedural protections that are due to a prison inmate facing a disciplinary action are far less than the due process protections afforded to a criminal defendant standing trial. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1973). But these protections do exist, and generally include advance written notice of the charges; a hearing affording a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *See Wolff*, 418 U.S. at 563–67. The procedures afforded, or more specifically the lack thereof, is central to Johnston's due process claim.

The law establishing what amount of due process is required when a prisoner's liberty interest is at stake has been clear since at least 1983, when the Supreme Court decided *Hewitt, supra. See Shoatz*, 2106 WL 595337, *13. Here, the summary judgment record, when viewed in the light most favorable to Johnston, raises genuine issues of material fact as to whether he has been deprived of due process rights under the Fourteenth Amendment that were well-established when Wetzel and Overmyer acted in this case. Accordingly, the Court finds that the Defendants are not entitled to qualified immunity.

VI.    Conclusion

For the reasons discussed above, Plaintiff Norman Johnston's motion for summary judgment (ECF No. 46) and Defendant John Wetzel and Michael Overmyer's motion for summary judgment (ECF No. 50) are denied.

Ordered and entered this 27th day of December, 2019.

RICHARD A. LANZILLO
United States Magistrate Judgment